UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

SAMUEL LENOROWITZ, Individually and on behalf of all others similarly situated

*Plaintiff*,

v.

MOSQUITO SQUAD FRANCHISING, LLC; MOSQUITO SQUAD OF FAIRFIELD AND WESTCHESTER COUNTY; and JOHN DOES 1-25.

*Defendants.*

No. 3:20-cv-1922 (OAW)

**ORDER DENYING MOTION TO CONDITIONALLY APPROVE CLASS SETTLEMENT**

Plaintiff commenced this class action and filed a Complaint (ECF No. 1) alleging that Defendants violated the Telephone Consumer Protection Act, 47 U.S.C. §§ 227, *et seq.* (TCPA) by spamming consumers with unsolicited messages advertising the defendants' pest control services. After discovery, class certification briefing, an attempt to appeal the court's certification order (ECF No. 84), summary judgment briefing (ECF No. 85), and mediation before the Honorable Judge Andersen (Ret.), the parties reached a settlement agreement that is the subject of this order, ECF No. 116. For the reasons detailed below, the motion hereby is **DENIED**.

**LEGAL STANDARD**

To protect the interests of absent class members, judges are required to scrutinize class-wide settlements. Fed. R. Civ. P. 23(e). Approval of class wide settlements proceed in two stages: (1) preliminary approval, and (2) final approval. Here, the parties seek preliminary approval.

1

At preliminary approval, the court must determine whether it "will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litig.*, 330 F.R.D. 11, 28 (S.D.N.Y. 2019). "Even at the preliminary approval stage, the Court's role in reviewing the proposed settlement 'is demanding because the adversariness of litigation is often lost after the agreement to settle.'" *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 692 (S.D.N.Y. 2019) (Rakoff, J.) (quoting *Zink v. First Niagara Bank, N.A.*, 155 F. Supp. 3d 297, 308 (W.D.N.Y. 2015) (citation omitted). Here, the class is certified; thus, the court narrows its focus to the first prong.

The court considers whether it is likely to approve the settlement under Fed. R. Civ. P. 23(e)(2). In so doing, the court reviews the proposed settlement agreement against the factors articulated in both *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974) and Rule 23. *See In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 692 (considering the Advisory Committee Notes to the 2018 amendments to Fed. R. Civ. P. 23(e)(2) together with the *Grinnell* factors); *see also* § 13:13. Standard for granting preliminary approval—Generally, 4 Newberg and Rubenstein on Class Actions § 13:13 (6th ed.) (the court ought to approve a "proposed settlement [that] appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible [judicial] approval").

**DISCUSSION**

Class actions serve as a deterrent by forcing individuals and businesses to pay damages for their wrongs.  *See* Brian T. Fitzpatrick, Do Class Action Lawyers Make Too Little?, 158 U. Pa. L. Rev. 2043, 2058 (2010).  That deterrent effect is undermined when the defendant remains eligible to recoup a significant amount of the settlement fund through the placement of a reversionary clause in the settlement agreement.  *See In re Baby Products Antitrust Litigation*, 708 F.3d 163, 172 (3d Cir. 2013) ("Reversion to the defendant risks undermining the deterrent effect of class actions by rewarding defendants for the failure of class members to collect their share of the settlement.").

Class actions efficiently vindicate substantive rights, but reversion clauses undermine those rights by incentivizing obstacles to claiming settlement funds (which themselves are the presumptive property of the class).  American Law Institute, Principles of the Law of Aggregate Litigation § 3.07, cmt. b (2010).  Such obstacles benefit defendants by allowing them to claim class members' property *and* to obtain releases precluding the very same class members from reclaiming that property.

Admittedly, it would be abnormal and nearly unprecedented for over 20 percent of a class of this size to make a claim.  *Hernandez v. Immortal Rise, Inc.*, 306 F.R.D. 91, 100 (E.D.N.Y. 2015) (finding a 20 percent return rate "well above average in class action settlements") (citing 2 McLaughlin on Class Actions § 6:24 (8th ed.) ("Claims-made settlements typically have a participation rate in the 10–15 percent range.")).  The modest recovery typical of class actions, together with the burden of completing a claim form often results in payouts to class members being significantly less than the total settlement amount available for disbursement.  *In re TJX Companies Retail Sec. Breach Litig.*, 584

3

F. Supp. 2d 395, 405 (D. Mass. 2008) (Young, J.) (explaining that in "a reversionary common fund or a claims-made settlement, the defendant is likely to bear only a fraction of the liability to which it agrees"). "The heart of the concern ... is the risk that settlement agreements will be designed to give the appearance of the creation of a very large fund upon which fees may be based, frequently combined with low participation rates". *Parker v. Time Warner Entertainment Co., L.P.*, 631 F. Supp. 2d 242, 265 (E.D.N.Y. 2009), *aff'd*, 378 Fed. App'x 63 (2d Cir. 2010). Therefore, where a reversionary clause remits unclaimed funds to the defendant, the defendant "wins" at the expense of the class members' substantive rights because they recoup a large sum of the settlement fund.

Relatedly, reversionary clauses obscure fee determinations, and also whether class counsel merits the fee they receive. *Espinal v. Victor's Cafe 52nd St., Inc.*, No. 16-cv-8057 (VEC), 2019 WL 5425475, 2019 U.S. Dist. LEXIS 183642, *11-12 (E.D.N.Y. Oct. 23, 2019) (reducing fee awarded to class counsel because the operation of the reversionary clause resulted in a fraction of the "illusory" settlement amount to be paid to class members). Justice Sandra Day O'Connor's statement in the case of *Int'l Precious Metals Corp. v. Waters*, 530 U.S. 1223 (2000) expressed concern that its class counsel garnered a fee award more than double what class members received in payouts after the claims deadline. The remainder of the fund reverted to the defendant. *Id.* Justice O'Connor suggested that there must be a "rational connection between the fee award and the amount of the actual distribution to the class," *id.*, or presumably between the fee award and the amount distributed to parties with interests reasonably approximate to the class (through cy pres distributions), *see, e.g.,* American Law Institute, Principles of the Law of Aggregate Litigation § 3.07, cmt. b (2010) (preferring to give unclaimed funds to

4

class members who submitted valid claims forms, but if that is not feasible, "[c]y pres is preferable" to reversion).   This assessment of whether such a rational connection exists only can be done *after* preliminary approval, and several months of outreach and its related administration costs.  Reversionary clauses make it difficult for courts to ascertain at any earlier point the fairness of any proposed resolution (and whether the defendant, its attorneys, or class counsel receive an outsized benefit from class litigation).[1]

Reversionary clauses also cloud Rule 23(e) analysis, leaving the court to guess "the proportionality between the settlement's value and Plaintiffs' expected recovery at trial, which is the single most important factor in determining whether the settlement is substantively fair and adequate."  *Minor v. FedEx Office & Print Servs.*, No. 09-cv-1375, 2013 U.S. Dist. LEXIS 18224, 2013 WL 503268, at *4 (N.D. Cal. Feb. 8, 2013).

For these reasons, courts generally disfavor reversionary clauses.  § 12:29. Reversion to defendant(s), 4 Newberg and Rubenstein on Class Actions § 12:29 (6th ed.); *see In re Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation*, 895 F.3d 597, 612 n. 20 (9th Cir. 2018) ("commentators and courts disfavor reversions because they arguably undermine the deterrent effect of class actions"); *see also Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 785 (7th Cir. 2004*)* (questioning the validity of reversionary clauses that permit unclaimed funds to remit to the putative wrongdoer).

Courts' suspicions are particularly heightened when the settlement agreement includes a "clear sailing clause," through which the defendants agree not to object or to contest plaintiffs' counsel's attorney fee application.  *See In re Wawa, Inc. Data Sec. Litig.*,

---

[1] With the clear sailing provision, the court does not have the benefit of the adversarial process during the final approval hearing.

85 F.4th 712, 724–25 (3d Cir. 2023) ("Courts…must be on the lookout for clear sailing clauses"), *Roes, 1-2 v. SFBSC Mgmt.*, LLC, 944 F.3d 1035, 1060 (9th Cir. 2019) (heightened inquiry is "imperative" when a court is presented with both a clear sailing provision and reversionary clause), *Hofmann v. Dutch LLC*, No. 3:14-cv-02418 (GPC) (JLB), 2017 WL 840646, at *8 (S.D. Cal. Mar. 2, 2017) (describing clear sailing provisions as a "red flag indicating that the settlement may have been unfairly reached."), *Sylvester v. CIGNA Corp.*, 369 F. Supp. 2d 34, 47 (D. Me. 2005) ("the reverter clause and clear sailing clause raise a presumption of unfairness"), *Zawikowski v. Beneficial Nat'l Bank*, No. 98-cv-2178, 2001 U.S. Dist. LEXIS 3098, 2001 WL 290402, at *2 (N.D. Ill. Mar. 22, 2001) ("[R]eversion provisions need careful scrutiny."). That is because counsel might trade something of value, for example, a reversionary clause, for a clear sailing provision.[2] *Malchman v. Davis*, 761 F.2d 893, 908 (2d Cir. 1985) (Newman, J. concurring) ("It is unlikely that a defendant will gratuitously accede to the plaintiffs' request for a clear sailing clause without obtaining something in return"); *see also Vought v. Bank of Am., N.A.*, 901 F. Supp. 2d 1071, 1101 (C.D. Ill. 2012) (observing that every dollar left unclaimed is a dollar to cover the fees owed to class counsel). In such cases, the class is betrayed and only the attorneys benefit (an all-too-common criticism of class actions).

The court paid particular attention to the documents at ECF Nos. 116 and 116-1. The following reversionary clause appears in the parties' memorandum of law:

> *Any cash remaining in the Settlement Fund – after payment of all timely Claims of Claim Settlement Checks, the award of Attorneys' Fees and Expenses, as approved by the Court, the Incentive Awards to the Class Representative(s), as approved by the Court, and the any fees of the Administrator, as approved by the Court – <u>shall revert to Defendant</u>.*

---

[2] The court does not suggest that happened here; rather, the example is to highlight the risks posed by the coexistence of clear sailing and reversionary provisions.

ECF No. 116, pgs. 5-6 (emphasis added).[3]  Similar language appears in the settlement agreement (though in the long form notice rather than in the body of the document itself), *see* ECF No. 116-1 at 41-42, which also contains a clear sailing provision.  ECF No. 116 at 6 ("Plaintiff shall move the Court for an award of Attorneys' Fees and Expenses in an amount not to exceed $380,000.  Defendant has agreed not to oppose this motion.").[4]

However, Defendant agreed to make available, "as it becomes needed," any funds to cover the "Claim Settlement Payments," "all Notice and Administration Costs, and any Incentive Award in settlement in full of this Action."  ECF No. 116-1 at 11.  Thus, the Settlement Fund is not a sum certain; in a sense it is "imaginary," or illusory.  *Cunningham v. Suds Pizza, Inc.*, 290 F. Supp. 3d 214, 224 (W.D.N.Y. 2017).  It is money Defendant will provide "as needed."  Money set aside for settlement payments should deemed the property of class members.  To the extent defendants might maintain control over Claim Settlement Payments in attempting to maintain a property interest in them, the court would not likely find such a strategy persuasive, for execution of a Settlement Agreement renders a class defendant's interest in their related property subject to disbursement to others (through claim settlement payments, Notice and Administration Costs, etc.).  *See Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011) ("The settlement-fund proceeds, having been generated by the value of the class members' claims, belong solely to the class members.").  Thus, there is no material distinction between cases

---

[3] Page numbers cited in the instant ruling refer to those assigned by the court's electronic filing system (CM/ECF) and not necessarily to counsel's pagination.

[4] As an additional basis for denial, the court observed instances where language included in the memorandum of law (ECF No. 116) was not included in the settlement agreement (ECF No. 116-1).  The clear sailing provision is one example as it is not included in the settlement agreement even though the memorandum of law cites to "Exhibit A" (which does not exist) § II(D)(2).  The parties ought to include all relevant language in each document, otherwise it remains difficult to determine the terms of the agreement.

where settlement funds revert to the defendant, and the present circumstance wherein Defendant merely maintains control of them throughout the claims process and uses a reversionary clause to reinstate its property interest in settlement funds.

Reviewing the agreement as a whole, the court will not approve it.[5]  *See Lackawanna Chiropractic P.C. v. Tivity Health Support, LLC*, No. 18-cv-00649 (LJV) (JJM), 2019 WL 7195309, at *6–7 (W.D.N.Y. Aug. 29, 2019), *report and recommendation adopted*, No. 18-cv-00649, 2019 WL 7194525 (W.D.N.Y. Dec. 26, 2019). The combination of reversionary and clear sailing clauses threaten to undercut the deterrent effect of class actions, muddy the relationship between class counsel and the class members they represent by obscuring counsel's fees, open the door to collusive behavior between counsel for both parties, incentivize poor behavior, and take what is rightfully the property of the class.

Furthermore, it is questionable whether providing a voucher "for a one-time tick or general pest spray treatment" is fair and adequate to the class without being tethered to a showing that tick or pest spray treatment is worth $189, or that Defendant does not simultaneously promise not to increase the costs of its services, temporarily or otherwise, such that class members are still responsible for significant sums of money payable to the very entities that allegedly violated their substantive rights.  Finally, the court notes that texting a mobile number (after ensuring it is not a landline), would seem to be a feasible means of notice, given that at least some of the harm in this case is based on

---

[5] The court makes clear that it may consider other agreements with a reversionary clause, but the combination of the clear sailing agreement, the reversionary clause, and the voucher restrictions raise sufficient concern that the court cannot claim it would likely be able to approve the final proposal.

pre-recorded voice messages received on cellular phones.[6]  Accordingly, cellular communication would appear to be a certain mode of communication for those affected.

The court is mindful of the strong judicial policy in favor of settlements, particularly in the class action context as the compromise of complex litigation is encouraged by the courts and favored by public policy.  *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116-17 (2d Cir. 2005).  It also acknowledges the age of this case and the time it took for the court to carefully review the motion.  However, in genuinely fulfilling its obligation to ensure the settlement's underlying fairness to class members, approval is denied.

## CONCLUSION

The motion for preliminary approval of the class settlement is **DENIED** without prejudice subject to the parties' reaching an alternative agreement.

**IT IS SO ORDERED** at Hartford, Connecticut, this 9th day of December, 2024.

/s/
OMAR A. WILLIAMS
UNITED STATES DISTRICT JUDGE

---

[6] Understanding that people change phone numbers, it would seem practical to at least attempt contact via cellular phone.  After all, the ability to retain one's telephone number over time has become increasingly easy and common, regardless of physical relocation or changes in cellular service providers.